## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **Marilyn Nowakowski, an Individual,**<br><br>        **Plaintiff,**<br><br><br>**Marcin Chojnacki, an Individual, Kendall Murphy, an Individual, 1st Midwest Financial, Inc., an Illinois Corporation, Chase Real Estate, LLC, an Illinois Limited Liability Company, First National Financial Inc., an Illinois Corporation; Kathleen Long, an Individual, BLM Title Services, LLC d/b/a Lakeland Title Services, an Illinois Limited Liability Company, Law Offices of Brenda Murzyn, a Professional Corporation, and Brenda Murzyn, an Individual,**<br><br>        **Defendants** | **Case No.**<br><br>**Judge:**<br><br>**Magistrate:** |

## __COMPLAINT__

NOW COMES  the  Plaintiff, Marilyn Nowakowski, by and through her attorneys, Gaspero & Gaspero, Attorneys at Law, P.C., and in complaining against Marcin Chojnacki, an Individual, First National Financial, Inc. an Illinois Corporation, Kathleen Long, an Individual, Kendall Murphy, an Individual, 1st Midwest Financial, Inc., an Illinois Corporation, Chase Real Estate, LLC, an Illinois Limited Liability Company,  BLM Title Services, LLC d/b/a Lakeland Title Services, an Illinois Limited Liability Company, the Law Office of Brenda Murzyn, a Professional Corporation, and Brenda Murzyn, an Individual, allege as follows:

## JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the Plaintiff asserts claims arising under the Racketeer Influenced and Corrupt Organizations Act 18, U.S.C. § 1962.

This Court has supplemental jurisdiction over the Plaintiff's state law claims, pursuant to 28 U.S. § 1367.

## VENUE

Venue is proper in this District pursuant 18 U.S.C. § 1965 and 28 U.S. Code § 1391(c)(2), whereas multiple Defendants are residents of Illinois and the real estate at issue is located in Northern Illinois.

Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district and reside in this district.

## PARTIES

1.     Plaintiff Marilyn Nowakowski ("Marilyn"), an individual, is an Illinois citizen.

2.     Defendant Marcin Chojnacki ("Chojnacki"), an individual, is an Illinois licensed real estate broker and an Illinois citizen.

3.     Defendant Kendall Murphy ("Murphy"), an individual, is an Illinois citizen.

4.     Defendant 1st Midwest Financial, Inc., is an Illinois Corporation and a citizen of Illinois in that its principal place of business is in the State of Illinois.

5.     The president of 1st Midwest Financial, Inc. is Defendant Kendall Murphy. Despite its name, 1st Midwest Financial, Inc. has no relationship with First Midwest Bank (First

Midwest Bancorp, Inc.) the widely known, publicly traded commercial banking and financial services institution that carried the name until it was acquired by Old Republic Bank in 2022.

6.      Defendant First National Financial Inc. is an Illinois Corporation and a citizen of Illinois in that its principal place of business is in Illinois.

7.      Defendant Kathleen Long ("Long") is a citizen of Illinois and the President and Secretary of Defendant First National Financial, Inc.  At all times relevant herein, Long was the cohabitant and paramour of Chojnacki.

8.      Defendant Chase Real Estate, LLC ("Chase Real Estate") is an Illinois Limited Liability Company with its principal place of business in the State of Illinois. The manager and sole member of Chase Real Estate, is Christian Chase, a citizen of Illinois.

9.      "Flip Chicago" appears to have been an un-incorporated enterprise organized by Chojnacki and operated as part of Chase Real Estate.  "Flip Chicago" held itself out as a real estate investment company for the purposes of inducing and capitalizing on inexperienced investors in connection with Illinois real estate.

10.     BLM Title Services, LLC d/b/a Lakeland Title Services, is an Illinois Limited Liability Company (Lakeland Title) and is a citizen of Illinois.

11.     The Law Office of Brenda Murzyn is an Illinois Professional Corporation whose principal place of business is in Naperville, Illinois.  The Law Office of Brenda Murzyn is a citizen of Illinois.

12.     Brenda Murzyn, an Individual, is an attorney licensed to practice law in Illinois and citizen of Illinois (Brenda).  Brenda is the owner and a Manager of Lakeland Title and signatory on its bank accounts.

13.     Brenda, along with Michael Okoye, associate attorney with the Law Offices of Brenda Murzyn, and Jaime Eddy, an attorney no longer licensed to practice law, were, at all times relevant herein, listed as the "Investor Attorney" legal team on the Chase Foreclosure website (www.chaseforeclosure.com) (See Exhibit 1).

## ALLEGATIONS COMMON TO ALL COUNTS

### Part I of the Fraud: Luring the Investor –
### Chase Real Estate Services and "Flip Chicago"

14.     In 2017, Marilyn saw an advertisement on social media inviting the reader to contact Chase Real Estate Services also known as "Flip Chicago" which identified itself as a system for real estate investment.

15.     Specifically, Flip Chicago, a/k/a Chase Real Estate Services, promised to assist the investor in the purchase of residential real estate (single family homes) and then provide post-closing services relative to renovating the property so that it could be quickly resold at a profit (or "flipped") or be rented out.

16.     Marilyn sent a query to "Flip Chicago" / Chase Real Estate Services in response to the advertisement.

17.     Marilyn's query prompted a response from Defendant Chojnacki.  The response from Chojnacki evolved into sustained text and phone interactions through which Chojnacki drew Marilyn into the scheme giving rise to this action.

18.     Chojnacki told Marilyn that he was a real estate broker with Chase Real Estate LLC.  Chojnacki told Marilyn that "Flip Chicago" is the same company as Chase Real Estate LLC.

19.     Chojnacki actively led Marilyn to believe that since he would represent her as an agent of Chase Real Estate, and because "Flip Chicago" is the same company as Chase Real

Estate, that the transactions would be safely negotiated and consummated under the auspices of Chase Real Estate.

20.     At all times relevant herein, the websites for Flip Chicago was very similar to the website for Chase Real Estate "chaseforeclosure.com" (See printed copy of the Chase Flip Chicago website attached as Exhibit 2, the Chase Real Estate Website at Exhibit 3, the Flip Chicago "System" website at Exhibit 4 and the Chase Foreclosure "System" website at Exhibit 5).

21.     The Chase Real Estate and Flip Chicago websites include many photos of the same persons – including Chojnacki.  The professional portrait photographs of Chojnacki is precisely the same photographs on both the Flip Chicago and the Chase Real Estate websites. (See Exhibits 1 through 5).

22.     Chojnacki stressed to Marilyn that they "do it all."  Chojnacki told Marilyn that she did not have to worry about anything, they are a "one stop shop."

23.     Chojnacki told Marilyn that the property flips could be done quickly because the properties they would find for her were in a suitable condition to allow reasonable renovations within a short timeframe.

24.     Chojnacki told Marilyn that a key component in the Chase Real Estate service that they would provide to her would be assistance in locating and making offers on suitable "Real Estate Owned" investment properties.

25.     This was a key component to the Chase System.

**Part II of the Fraud: The REO and Imposter Bank Seller**

26.　　Chojnacki told Marilyn that through the Chase Real Estate "Flip Chicago" system, Marilyn would be purchasing single family homes from banking institutions which had foreclosed on the previous owners/borrowers.

27.　　Chojnacki represented that the properties were Real Estate Owned (REO) properties.

28.　　REO is a term of art referring to a lender-owned property that went unsold at a foreclosure auction. Properties become REO when borrowers default and the lender repossesses and attempts to sell them.　The lender bank takes ownership of a foreclosed property when it fails to sell at auction at the amount sought to cover the loan. These REO properties are generally understood to be attractive to certain investors because they can be acquired from the foreclosing bank or the bank's asset managers at a significantly discounted price.

29.　　Chojnacki assured Marilyn that all of the properties Marilyn would be making offers on were REO properties being offered for sale by the REO bank or its asset manager.

30.　　Accordingly, a significant component to the investment was the discounted price for which the property could be acquired from the foreclosing bank or its asset manager.

31.　　Chojnacki specifically represented that he would assist Marilyn in crafting an appropriate offer to the REO institution.

32.　　He assured Marilyn that he and his company had an ongoing professional relationship with these banks and bank asset managers, and therefore that would be a reason to expect respectable treatment during the offer process.

33. The truth was that the seller of the property was not an REO bank, nor was it a bank asset manager, but rather a corporation owned by an affiliate of Chojnacki, with a deceptive and deliberately misleading name ("1st Midwest Financial, Inc." or "First National Financial").

**The Imposter Banks:  1st Midwest Financial, Inc. and First National Financial**

34. Despite its misleading name, Defendant 1st Midwest Financial, Inc., has no affiliation with First Midwest Bancorp., the widely known bank headquartered in Chicago which was one of the largest banking institutions in the United States until its 2022 acquisition by Old National Bank.

35. Defendant 1st Midwest Financial, Inc. has no banking license or any other financial services credentials.

36. Similarly, Defendant First National Financial has no affiliation with First National Financial LP, a public financial institution based in Toronto, Ontario, whose total assets exceed $143 billion and whose CEO was recently inducted into the Canadian Business Hall of Fame.

37. Defendant First National Financial has no banking license or any other financial services credentials.

38. As with 1st Midwest Financial, Inc. and First National Financial, in furtherance of their overall scheme, Defendants and/or their affiliates have formed corporations using other major bank names, such as BMO (Bank of Montreal) and FNBO (First National Bank of Omaha).

39. Nonetheless, as part of Defendants' overall scheme that is the subject of this lawsuit, Defendants 1st Midwest Financial, Inc., posing as a bank, and First National Financial, also posing as a bank, previously acquired (or contracted to acquire) three properties from the actual REO bank or bank asset manager at the discounted prices promised to Marilyn.

7

40.     These impostor banks then sold the properties to Marilyn at inflated prices with the other Defendants acting as their accomplices.

41.     Thus, the primary component of Defendants' fraud scheme was to mislead Marilyn into believing she was buying properties at the REO prices directly from the REO bank or its asset managers.

42.     The offer and acceptance process that Chojnacki described to Marilyn was a farce. The purchase price of a property was unilaterally determined by the affiliated Defendants before any so-called offer was crafted and "accepted."

43.     When Marilyn actually purchased a property from the imposter bank, she ended up paying an undisclosed mark-up. Thus, Defendants and their affiliates at the impostor banks which sold the properties to Marilyn deprived Marilyn of the value of the discount embedded in the promise that the acquisition would be from an REO lender or asset manager.

44.     This complex of misleading statements, active concealments, deceptive practices and failures to disclose occurred notwithstanding the fact that Chojnacki was Marilyn's Designated Real Estate Broker and Chase Real Estate was Marilyn's Designated Real Estate Brokerage Firm in the purchase transactions.

45.     The impostor bank, 1st Midwest Financial, Inc., states on its corporate filings that its President is Defendant Kendall Murphy. Kendall Murphy's address on the corporate filings is 1046 Midwest Road, Northbrook, Illinois – which is a non-existent address (likely contrived to mislead the public to believe that the "bank" was located on the vanity namesake street, a common practice for very large corporations). (See Exhibit 6).

46.     When a legitimate address was required for a closing statement or for a deed, 1st Midwest Financial, Inc. provided the address of 30W121 Estes Street in Naperville, Illinois –

which was a foreclosure property with an apparently abandoned house near an industrial area in northwestern Naperville. (See Exhibit 7). As of the filing of this action, this address is a vacant lot.

47.     Similarly, the imposter bank First National Financial states on its corporate filings that its President is Kathleen Long, Chojnacki's paramour and roommate. Its corporate address – 611 Dartmouth in Schaumburg, Illinois, is actually a single-family home owned by, on information and belief, Defendant Long's parents. (See Exhibit 8).

### The Dante Property

48.     Following their initial conversations, Chojnacki sent Marilyn information relating to an REO, a single-family home at 15849 S. Dante Dr., South Holland, Illinois (the "Dante" property).

49.     Chojnacki represented that the Dante property would be an ideal REO to quickly flip and was a bargain for the purchase price of $67,000.00.

50.     In follow-up conversations, Chojnacki assured Marilyn that she would make money on the Dante property and that it was a great deal.

51.     Throughout the transaction, Chojnacki referred to the Dante property as an REO deal under the Chase Real Estate Flip Chicago system.

52.     Marilyn believed Chojnacki's representations that the Dante property was an REO property because the seller's name – First National Financial- sounded like the bank.

53.     Chojnacki continued to stress that the Chase Flip Chicago system was a one stop shop. He referred Marilyn to the Chase Flip Chicago "System" – which looks nearly identical to the Chase Real Estate foreclosure "System." (See Exhibits 1 through 5).

54.     A key aspect of the system was that Chojnacki would be able to not only assist in locating the properties, but would also be able to coordinate the closing on the property, and coordinate and handle the repairs in order to flip the property quickly.

55.     Marilyn was not experienced in real estate, and she grew to trust and rely on Chojnacki throughout this process.

56.     Chojnacki always appeared experienced and charming, and she believed what he told her as her Chase Real Estate realtor.

57.     All of Chojnacki's communications came from the Chase Real Estate platform – and Marilyn believed Chojnacki was affiliated with a reputable real estate brokerage firm.

58.     When she was getting ready to enter into a purchase agreement for her first property – the Dante property – Marilyn worried about finding an attorney to represent her for the transaction.

59.     Marilyn specifically asked Chojnacki how she was to find an attorney. Chojnacki told her not to worry – that he would provide an attorney for her.  Chojnacki showed Marilyn the Chase Flip Chicago website where part of the System was providing an attorney for the buyer investor.

60.     Chojnacki told Marilyn that Defendant Brenda Murzyn was her attorney for the Dante transaction.

61.     Chojnacki told Marilyn that Brenda would prepare and review her documents.

62.     At all times throughout the process, Marilyn believed that Defendant Brenda was her attorney as buyer.  She relied on the assistance and advice of Brenda and believed Defendant Brenda was acting on her behalf to protect her in the process.

63.     Marilyn communicated to Brenda and her office staff during the process by phone and by email.

64.     Marilyn called Brenda and asked her questions and Brenda answered them, never advising Marilyn she was not her attorney.

65.     Marilyn also emailed Brenda's staff at the blmtitle.com email addresses, believing she was communicating with the law firm.

66.     For example, Marilyn was concerned about certain duplicate documents and Brenda's staff emailed Marilyn back telling Marilyn not to worry.  (See Exhibit 13).

67.     In actuality, Brenda was the attorney for the seller in the transaction and was not acting on behalf of Marilyn's interests at all.

68.     Brenda was also the owner of the title company in the transaction – Lakeland Title.  Lakeland Title was an assumed name for BLM Title.

69.     When Brenda received an email from the "blmtitle" email address, she believed she was receiving an email from Brenda's law office.

70.     Accordingly, unbeknownst to Marilyn, Marilyn was unrepresented during this transaction even though she was told by Chojnacki that Brenda was her attorney and was acting on her behalf.

71.     Marilyn entered into an agreement to purchase the Dante REO property on June 13, 2017 for $67,000.00.

72.     At all times through the process, Marilyn believed she was purchasing the Dante property as an REO from the bank or its asset manager.

73.     On June 27, 2017, the Dante property closing occurred at Brenda's Lakeland Title office.  The seller was First National Financial and the purchase price was $67,000.00.

74.     Brenda prepared the documents and Chojnacki reviewed them with Marilyn and assured her all was ok.

75.     However, unbeknownst to Marilyn, Chojnacki's paramour and roommate, Defendant Long, had just purchased the property from the real REO bank on June 8, 2017 for $35,000.00.

76.     This fact – and the $32,000.00 price mark up – was not disclosed to Marilyn.

77.     Chase Real Estate received an undisclosed commission on the sale of the property. (See Group Exhibit 9).

78.     Defendant Lakeland Title acted as the title company for the Dante sale to Marilyn and the closing took place at its Naperville office, which is in the same building as Brenda's law office.  Lakeland Title received $2,273.00 in various closing, settlement, and title fees.

79.     Brenda received $200.00 as seller's attorney for preparing the closing documents.

80.     No buyer attorney is listed on the settlement statement.  (See Group Exhibit 9).

81.     Defendant Lakeland Title provided the cover of a legitimate real estate title company, received closing, settlement and escrow title fees from First National Financial and Marilyn, and coordinated the title search, title report, chain of title, and issuing of the title commitment.

82.     As part of the Chase Flip Chicago Scheme, Defendant Brenda, individually and as an attorney with the Law Offices of Brenda Murzyn, at other times represented "investor buyers" as buyer's attorney in Chase Real Estate transactions, further facilitating the fraud regarding the true owners of the subject transactions.  (www.chaseforeclosure.com) (See Exhibit 1).

83.     Defendant Chojnacki at all times held himself out to be an agent of and acting on behalf of Marilyn.

84. At no time did Defendant Chojnacki disclose any conflict of interest.

85. Defendant Chojnacki made misrepresentations to Marilyn to induce her to consummate the Dante transaction.

86. Following the Dante purchase, Chojnacki continued to send advertisements to Marilyn for more "REO deals."

**The John Street and Huron Street Properties**

87. On January 8, 2018, Marilyn received an advertisement from Chojnacki, via his "mychaseagent" email for 17809 John Street, Country Club Hills (the "John Street" property).

88. Chojnacki directed Marilyn to the Flip Chicago website, which listed the property as an REO. The "bank" wanted $79,000.00 for the property.

89. Chojnacki told Marilyn that the $79,000.00 asking price was a great deal and that the property would be easy to rehab and flip.

90. Following Chojnacki's advice, Marilyn entered into a purchase contract on January 29, 2018 with the purported "bank" Seller, First National Financial.

91. Marilyn asked Chojnacki if he would provide her an attorney for her purchase, as he had with the Dante transaction.

92. Chojnacki told Marilyn that this time, Vincent Incopero, of the Real Law Group, P.C. (now dissolved) would be her attorney for the transaction.

93. During the transaction, Marilyn communicated with Vincent, and his staff at the Real Law Group, and believed that they were her attorneys for the John Street transaction.

94. Closing on the John Street property occurred on or about February 2, 2018.

95. Vincent prepared the closing documents and sent them to Marilyn.

96. Chojnacki reviewed the documents with Marilyn and told her everything was ok.

97.     Marilyn trusted and believed Chojnacki, as her agent.

98.     However, contrary to Chojnacki's representations, First National Financial was not a bank, but instead was an entity owned and controlled by Defendant Long, Chojnacki's paramour and roommate.

99.     Also contrary to Chojnacki's representations, this was not an REO transaction.

100.    Unfortunately for Marilyn, shortly before Marilyn's closing, Defendant Chojnacki's paramour Long, via the "imposter bank" had secretly purchased the John Street property from the actual REO Bank, Wells Fargo for $66,000.00, $13,000 less than the $79,000.00 they charged Marilyn after the bogus negotiation. (See Group Exhibit 10).

101.    This undisclosed markup by Defendants deprived Marilyn of the discount she was supposed to receive from the REO transaction.

102.    Chojnacki continued to induce Marilyn to purchase more properties, and sent Marilyn email solicitations for a third property, 2645 W. Huron, Chicago, Illinois (the "Huron" property).

103.     Chojnacki told Marilyn that the Huron property was a great deal and would be easy to flip.  He assured Marilyn that the bank's asking price of $383,000.00 was a bargain.

104.    Marilyn believed Chojnacki and entered into a contract to purchase the Huron property on February 1, 2018.

105.     Marilyn already believed Vincent Incopero was her attorney for the John Street property.  When Marilyn asked Chojnacki who her attorney would be for the Huron transaction, Chojnacki told Marilyn to "just call Vincent."

106.    At no time did Marilyn know that Vincent was not her attorney, and in fact was attorney for the seller.

14

107.    Marilyn called Vincent's office and spoke to both Vincent and his staff with questions throughout the process.  Her questions were always answered and she believed they were her attorneys working on her behalf.

108.    Defendant Chojnacki at all times held himself out to be agent of and acting on behalf of Marilyn.

109.    At no time did Defendant Chojnacki disclose any conflict of interest.

110.    Defendant Chojnacki made misrepresentations to induce Marilyn to consummate the Huron Street transaction.

111.    On March 16, 2018, the closing occurred for the Huron property and Marilyn acquired title.   The purchase price was $383,000.00.

112.    When Marilyn called Vincent he answered her questions.  Vincent sent the closing documents to Marilyn.  (See Exhibit 11).

113.    As he always did, Chojnacki reviewed them with Marilyn and assured her all was well.

114.    However, unbeknownst to Marilyn, Defendants had just purchased the Huron Street property from the real bank – Wells Fargo – on December 4, 2017 for $330,000.00. (See Group Exhibit 12).

115.    Again, Marilyn this markup was not disclosed to Marilyn and she was deprived of the discount she would receive from the REO bank because Defendants took that discount for themselves.

116.    Notably, in the Huron Street transaction, Defendant First National Financial purchased the REO property from Wells Fargo on December 4, 2017.  (See Group Exhibit 12).

117. Then, on February 5, 2018, in anticipation of Marilyn's closing, First National Financial conveyed title to Defendant 1st Midwest Financial for zero consideration. (See Group Exhibit 12).

118. Then, on March 15, 2018, 1st Midwest Financial conveyed the property to Marilyn for $383,000.00. (See Group Exhibit 12).

119. These conveyances between Defendants First National Financial and 1st Midwest Financial, all without consideration, were necessary to hide the fact that the imposter banks had purchased the Huron property at the promised discount themselves. (See Group Exhibit 12).

120. Defendants, all working in concert, continued to conceal the fraud perpetuated against Marilyn.

**Part III of the Fraud: The Renovations**

121. Defendant's fraudulent and deceptive practices continued after the closing of the transactions and into the renovations phase.

122. The fraud and deception came in the form of fraudulent billing, and active concealment of the properties' condition (along with the related violations with the municipal requirements).

123. The point of the purchases was to enable Marilyn to quickly flip the properties and sell them at a profit once they had been renovated. Chojnacki told Marilyn that, in essence, Chase and Flip Chicago "do everything" with regard to the renovations.

124. Defendants told Marilyn that the property flips could be done in a time efficient manner because the properties were in a suitable condition to allow reasonable renovations within a short timeframe.

125. The renovation period was a key step in the fraud-scheme because it enabled the Defendants to prevent the investor from discovering the impostor bank scam and to prevent the investor from learning the poor condition of the properties.

126. In connection with this portion of the fraud, the Defendants perpetrated a complex scheme of falsified billings and exorbitant charges for poorly performed work.

127. The invoices generally fail to itemize the work being done to justify the cost.

128. Defendants, acting in concert, actively concealed and perpetuated the fraud against Marilyn.

129. Through Defendants' coordination of imposter banks, using their status as Marilyn's realtor and real estate brokerage firm, the "Chase Foreclosure" and "Flip Chicago" "System" and "providing" attorneys to Marilyn who really worked for the Defendants, Marilyn was prevented from learning of Defendants' fraud.

130. Alternatively, Defendants Chojnacki and Chase Real Estate were negligent in failing to disclose to Marilyn the true nature of the transaction and for failing to disclose the conflict of interest in each of the transactions.

131. Marilyn was devastated financially as a result of Defendants' scheme.

132. Despite this, Chojnacki continued to solicit Marilyn for other deals.

133. Marilyn was financially devastated and unable to participate, but she still never believed that Chojnacki would have defrauded her.

134. Chojnacki continued to tell Marilyn she had to invest in more deals to get more experienced.

135. Defendants have treated other individuals or entities in the same illegal manner alleged by Marilyn. There are fourteen other pending cases involving additional individuals

17

and/or entities who were similarly defrauded by precisely or nearly precisely the same pattern of artifices and fraudulent misrepresentations as set forth in this Complaint.

136.     Shortly before filing this action, Marilyn learned she also had been a victim of the Chase Real Estate Flip Chicago scheme.

137.     The Defendants are, at present, continuing to lure investors into the enterprise using the same scheme and under the same guises as those set forth herein. Accordingly, the conduct alleged herein constitutes the Defendants' regular method of conducting their business.

## COUNT I:  RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO) - 18 U.S.C. 1962(c), (d)

### (Defendants Chojnacki, First National Financial, 1st Midwest Financial Inc., Kathleen Long, Kendall Murphy)

Plaintiff re-states and re-alleges Paragraphs 1 through 137 as though fully stated herein.

### RICO Persons

138.     Defendants Chojnacki, First National Financial, 1st Midwest Financial Inc., Kathleen Long, and Kendall Murphy, are each capable of holding a legal or beneficial interest in property, and therefore each is a "person" within the meaning of 18 U.S.C. § 1961(3).

### The Rico Enterprise

139.     Defendants Chojnacki, Kathleen Long, First National Financial, 1st Midwest Financial Inc., and Kendall Murphy, were associated in fact, and constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate commerce. This enterprise shall be referred to herein as the "Flip Chicago Enterprise."

140.     The Flip Chicago Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

141.     The primary purpose of the Flip Chicago Enterprise was to lure and then fleece unsuspecting real estate investors for the financial benefit of Flip Chicago.

142.     For the purpose of 18 U.S.C. § 1962(c), and during the periods relevant to this complaint, said Defendants each had authority within the Flip Chicago Enterprise, and/or conducted or participated, directly or indirectly, in the conduct of the Flip Chicago Enterprise's affairs through the pattern of racketeering activity described herein.

**Effect on Interstate Commerce**

143.     The Flip Chicago Enterprise conducted its racketeering activity, in part, using the interstate mails and wire communications, including by use of the telephones, by electronic transfers of funds, and through the mailing of checks.

**Predicate Acts of Racketeering Activity**

144.     Through the Flip Chicago Enterprise, or in conspiracy with it, the Defendants conducted, engaged in, and participated in a pattern of racketeering activity, consisting, at a minimum, of the following predicate acts: (a) multiple violations of Title 18, United State Code, Sections § 1341, 1343, and 1346 (mail fraud and wire fraud).  The scheme to defraud was advanced, concealed or furthered by the use of the U.S. mail or wires.

145.     Specifically, the Defendants' predicate acts include, but are not limited to, the following:

    a) In furtherance of a scheme or artifice to defraud as defined in 18
       U.S.C. §§ 1341 & 1346, and with specific intent to defraud,
       Defendants placed ads on the Internet and on social media with the

19

intent to induce investors to participate in "REO" real estate opportunities when they actually intended to sell the duped investor their own significantly marked-up property.

b) Engaging in a sustained fiction with the victim, replete with misrepresentations and calculated omissions to keep the investor misled that their transactional counterparty was an REO bank selling the property directly to the investor at REO level pricing.

c) Concealing and misrepresenting known property defects and significant building code and occupancy violations from the investor with the intent of inducing the investor to enter into the transaction.

d) Engaging in post-closing fraudulent activity in the management of the property by continued concealment of known property defects, building occupancy and code violations, and fraudulent billing relating to the renovation and flip.

## Pattern of Racketeering Activity

146.    The Defendants acted, and conspired to act together, and in association with others knowingly and repeatedly committed the above fraudulent acts in furtherance of and for the purpose of enriching themselves financially and to otherwise further the ends of the Flip Chicago Enterprise.

147.    The predicate acts described above were related to one another as part of a common scheme or plan.

148.    Such unlawful conduct constituted a continuous pattern of racketeering activity beginning as early as June 2017, continue through the present, and are likely to continue into the foreseeable future.

## Conspiracy (18 U.S.C. § 1962(d))

## (Defendants Chase Real Estate, Lakeland Title, and Law Office of Brenda Murzyn, and Brenda Murzyn)

149.    As described above, Chase Real Estate, Lakeland Title, Law Office of Brenda Murzyn, and Brenda Murzyn, did knowingly agree to facilitate the Flip Chicago Enterprise

Defendants, and those acting in concert with them, to violate 18 U.S.C. § 1962(c) for the purpose of achieving and profiting from the racketeering activities described above.

150. In furtherance of that agreement, the said Defendants knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering.

151. Specifically, the Defendants described herein were either affiliated or controlled by the Flip Chicago Enterprise Defendants

152. The Defendants described herein knowingly provided auxiliary services with respect to the marketing, negotiation, and transaction of real estate closing services which were necessary to and facilitated the accomplishment of the goals of the Flip Chicago Enterprise.

153. Defendant Chase Real Estate LLC provided the cover of a legitimate real estate brokerage enterprise, oversaw the conduct and behavior of Chojnacki, and received a commission from First National Financial and 1st Midwest Financial, Inc. (the sellers) notwithstanding the fact that at all relevant times herein, they held themselves out as Marilyn's agent.

154. Defendant Lakeland Title provided the cover of a legitimate real estate title company, received closing, settlement and escrow title fees from First National Financial and 1st Midwest Financial and Marilyn, coordinated the title search, title report, chain of title, and issued the title commitment,.

155. Defendant Brenda and the Law Offices of Brenda, failed to properly disclose to Marilyn that they were representing Seller in the transaction and failed to disclose that they were not her attorney.

156.    As part of the Flip Chicago Scheme, Defendant Brenda, individually and as an attorney with the Law Offices of Brenda Murzyn, has also at other times represented "investor buyers" as buyer's attorney in Chase Real Estate transactions, further facilitating the fraud regarding the true owners of the subject transactions.  (www.chaseforeclosure.com).

### Injuries to the Plaintiff Business and Property

157.    As a direct and proximate cause of the described racketeering activities and violations of 18 U.S.C. § 1962(c), and the described conspiracy in violation of 18 U.S.C. § 1962(d), Marilyn has been injured in her business and property. The Defendants' racketeering activities caused Marilyn to invest more than $500,000 in real estate which the Defendants had actual knowledge was worth far less and said racketeering activities directly resulted and were the proximate cause of Plaintiff' loss of invested funds.

158.    The Defendants' racketeering activities further caused Marilyn substantial damages due to the fact that the Properties required far more significant repairs at a far greater expense to Marilyn than had been disclosed to her.

159.    Defendants also deprived Marilyn of the true "REO" discount by purchasing the Properties for themselves before selling them to Marilyn at a markup, all without disclosure to Marilyn.

160.    These injuries were a foreseeable consequence of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), and their conspiracy in furtherance of those racketeering violations, in violation of 18 U.S.C. § 1962(d).

**WHEREFORE**, Plaintiff MARILYN NOWAKOWSKI, respectfully requests the Court to enter judgment in her favor and against each of the Flip Chicago Enterprise Defendants and their conspirators and order the following relief:

(a) All damages proven pursuant to RICO, trebled as permitted by law;

(b) Punitive damages, attorney fees, and costs as permitted by law; and

(c) Such other and further relief as the Court may deem just and appropriate.

## COUNT II: COMMON LAW FRAUD

161.  Plaintiff restate Paragraphs 1 through 160 as if fully set forth herein.

162.  Defendant Chojnacki's statements set forth above concerning the sellers of the properties being "REO" banks, the purchase price being a "discount" and/or "REO" price, the condition of the Properties, and their status, were false statements of material fact.

163.  Defendant Chojnacki made the statements with knowledge that they were false.

164.  Defendant Chojnacki made the false statements with the intention to induce Marilyn to purchase the Subject Properties under falsified premises.

165.  Marilyn reasonably and justifiably relied on Chojnacki's false statements.

166.  Marilyn suffered damages due to reliance on the false statements.

167.  Accordingly, Chojnacki's statements, Marilyn's reliance thereon, and resulting damages constitute common law fraud.

WHEREFORE, Plaintiff MARILYN NOWAKOWSKI, prays that this Honorable Court enter judgment in her favor and against Defendants in an amount to be determined at trial, plus the costs of suit, attorneys' fees, and such other relief as this Court deems just and equitable.

**COUNT III: VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (ILLINOIS CONSUMER FRAUD ACT)**

168.    Plaintiff re-state Paragraphs 1 through 167 above as if fully set forth herein.

169.    Defendant Chojnacki's statements, including but not limited to his statements set forth above concerning the various properties, their "REO" or "bank sold" status, the sellers being "REO" or "bank" sellers, the properties' condition, and the alleged work performed that was either not performed or was performed inadequately and/or not up to code, were false statements of material fact and constituted a deceptive act or practice by the said Defendants.

170.    Defendant Chojnacki intended that Marilyn rely on the deception.

171.    The occurrence of the deception was in the course of conduct involving trade and commerce.

172.    The deceptions were originated by residents of Illinois, concern Illinois real estate, and have resulted in violations of Illinois municipal laws.  Accordingly, the conduct alleged herein directly and indirectly affects the State of Illinois.

173.    The deception was the proximate cause of actual damage to Marilyn.

174.    Accordingly, the conduct of deception perpetrated by Defendant Chojnacki constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

WHEREFORE, Plaintiff MARILYN NOWAKOWSKI, prays that this Honorable Court enter judgment in her favor and against Defendants in an amount to be determined at trial, plus the costs of suit, attorneys' fees, and such other relief as this Court deems just and equitable.

### COUNT IV: VIOLATION OF THE ILLINOIS REAL ESTATE LICENSE ACT

175.     Plaintiff re-state Paragraphs 1 through 174 above as if fully set forth herein.

176.     Defendant Chojnacki provided real estate services in this transaction as agent of Chase Real Estate LLC.

177.     Defendants Chojnacki and Chase Real Estate LLC were "Licensees" under the Real Estate License Act, 225 ILCS 454/1-1 *et seq*.

178.     Section 15-25 of the Real Estate License Act mandates that:

> Licensees shall treat all customers honestly and shall not negligently or knowingly give them false information.

179.     Section 15-5 of the Real Estate License Act specifies that:

> This Article 15 may serve as a basis for private rights of action and defenses by sellers, buyers, landlords, tenants, real estate brokers, and real estate salespersons.

180.     Defendants Chojnacki and Chase Real Estate LLC breached the requirements of the Real Estate License Act by committing the following actions:

a)  fraudulently misrepresenting that they represented the Plaintiff as buyer when in actuality they represented, were affiliates of and/or were direct agents of the seller;

b)  fraudulently misstating the condition of the Property;

c)  fraudulently misstating the tenancy of the Property;

d)  fraudulent falsification of the purported rent roll;

e)  fraudulently misrepresenting to the Plaintiff that the seller in the transaction was a directly sourced, off-market seller when in truth the Seller was comprised of, directly affiliated with or controlled by the Defendants themselves or were agents thereof;

      f)   negligently misrepresenting all the above (a) through (e) to the Plaintiff.

181.    Plaintiff relied on Defendants Chojnacki and Chase Real Estate LLC's statements and suffered damages therefrom.

WHEREFORE, Plaintiff MARILYN NOWAKOWSKI, prays that this Honorable Court enter judgment in her favor and against Defendants in an amount to be determined at trial, plus the costs of suit, attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT V: NEGLIGENT MISREPRESENTATION

182.    Plaintiff re-state Paragraphs 1 through 181 above as if fully set forth herein.

183.    Defendant Chojnacki's statements, including but not limited to his statements set forth above concerning the various properties, their "REO" or "bank sold" status, the "REO" or "bank" sellers, the properties' condition, their statements regarding the work that was either not performed and/or performed inadequately and/or not up to code, were false statements.

184.    Defendant Chojnacki made the false statements through negligence in ascertaining the truth of the statement by the party making it.

185.    Defendant Chojnacki's false statements were made with intention to induce Plaintiff to act.

186.    Defendant Chojnacki was acting as agent for Defendant Chase Real Estate LLC at the time he made the false statements to Plaintiff.

187.    Plaintiff's actions in consummating the transaction were in reliance on the false statements.

188.    Plaintiff's reliance was the proximate cause of damage to her.

189.    Defendant Chojnacki's statements therefore constitute Negligent Representation.

190.     Defendant Chase Real Estate failed to properly supervise Defendant Chojnacki.

191.     Defendant Chase Real Estate's failure to properly supervise Defendant Chojnacki was the proximate cause of damage to her.

WHEREFORE, Plaintiff MARILYN NOWAKOWSKI, prays that this Honorable Court enter judgment in her favor and against Defendants in an amount to be determined at trial, plus the costs of suit, attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT VI: UNJUST ENRICHMENT

192.     Plaintiff reallege and incorporate by reference herein the allegations of Paragraphs 1-191 of this Complaint, as if fully set forth herein.

193.     Defendants did conspire and collude in the undertaking to mislead Plaintiff into believing they would be acquiring investment property directly from a long-time seller.

194.     Plaintiff believed and relied on Defendants' scheme of misleading statements and conduct when she agreed to buy the Properties from Defendants, who had secretly already purchased the Properties directly from REO bank for less than the amount that they fraudulently induced Plaintiff to pay.

195.     Further, Plaintiff paid Defendants great sums of money to renovate the subject properties in order to flip them in a timely manner.  The work was either not performed and/or was not performed adequately.

196.     The direct and proximate cause of the Defendants was to deprive the Plaintiff of the fair bargain they had promised her.

197.     As a consequence of receiving and retaining the difference between the REO price and the fraudulently contrived price and receiving funds from Plaintiff and either not performing the work or not performing the work adequately, the Defendants have unjustly

retained a benefit to the Plaintiff's detriment, and Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, Plaintiff MARILYN NOWAKOWSKI, respectfully requests the Court to enter judgment in her favor and against each of Defendants and order the following relief:

a) Payment to the Plaintiff of the benefit that they received as a consequence of their fraudulent misrepresentations being the difference between the purchase price of the Property paid by Plaintiff and that paid by themselves or such other amount to be proven at trial;

b) Return of funds paid by Plaintiff for renovation of the properties;

c) Punitive damages, attorney fees, and costs as permitted by law; and

d) Such other and further relief as the Court may deem just and appropriate.

Respectfully Submitted,

/s/Carmen Gaspero

_____

/s/Lisa Gaspero

_____

Marilyn Nowakowski
By: Her Counsel

Gaspero & Gaspero
Attorneys at Law, P.C.
Carmen A. Gaspero
Lisa M. Gaspero
2001 Butterfield Rd., Suite 1022
Downers Grove, Illinois 60515
630-687-9700