**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARILYN NOWAKOWSKI, | ) | |
| | ) | |
| *Plaintiff*, | ) | No. 24 C 11565 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| MARCIN CHOJNACKI, *et al*., | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION & ORDER**

Illinois resident Marilyn Nowakowski brought a complaint alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 1). It is one of 15[1] related cases, all in front of this Court, that Plaintiffs' attorneys have brought alleging that various overlapping Defendants engaged in a fraudulent real-estate investment scheme. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

Over the course of the litigation, numerous defendants settled in all of the related cases. Nonetheless, three separate sets of Defendants filed motions for summary judgment against Plaintiffs: Defendants Kendall Murphy and 1st Midwest Financial, Inc ("Murphy Defendants") (Dkt. 104); Defendants First National Financial, Inc. (FNF) and Kathleen Long ("Long Defendants") (Dkt. 99); and Defendant Marcin Chojnacki (Dkt. 101). In this case, Plaintiffs' Amended Complaint alleged that Chojnacki, the Murphy Defendants, and the Long Defendants individually violated 18 U.S.C.§ 1962(c), (d). (Dkt. 1 ¶¶ 138–148).

[1] There were as many as 16 related cases, but one, *Ascot Specialty Insurance Company, A Rhode Island Corporation v. Midwest Title & Closing Services LLC et al*, 1:24-cv-05216, settled and closed on December 4, 2025.

For the below reasons, Chojnacki's Motion for Summary Judgment (Dkt. 101), the Long Defendants' Motion (Dkt. 99) and the Murphy Defendants' Motion (Dkt. 104) are granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants the Murphy Defendants' and the Long Defendants' Motion on Count VI for Unjust Enrichment. The Court grants Chojnacki's Motion with regard to violation of the IRELA (Count IV) and it denies the motion as to common-law fraud (Count II); violation of the ICFA (Count III); negligent misrepresentation (Count V); and the follow-on claim of unjust enrichment (specifically for Chojnacki) (Count VI), which remain in the case and will proceed to trial unless the parties can reach a settlement.

**BACKGROUND**

Related cases in this litigation have already made clear the shortcomings of the present record. To summarize some of the most pertinent issues discussed therein: Plaintiffs' attorneys regularly inserted entire paragraphs worth of fact into their 56.1 Response entries, routinely provided massive string cites that did not justify the stated assertions, and consistently inserted their legal allegations and conclusory assessments—including entire swaths of their expert reports—as statements of "fact," all of which the Court ignored. On multiple occasions. the Plaintiffs' attorneys cited to the allegations in the Complaint, rather than admissible evidence, in their 56.1 statements; multiple parties inappropriately admitted facts and then proceeded to provide further information in the response. The Defendants, meanwhile, routinely base their 56.1 statements on the plaintiffs' depositions in these cases and then proceed to object to plaintiffs' own citations to those exact same depositions—often the exact same *portion* of the depositions—as

inadmissible hearsay (though this characterization is frequently incorrect under the party-opponent admission exception under Federal Rule of Evidence 801(d)(2)(D)).

As made clear throughout the related cases, this Court has the discretion to deem admitted facts that either side does not expressly admit yet fails to dispute with citations to admissible evidence in the record. *See Dade v. Sherwin–Williams Co.*, 128 F.3d 1135, 1139 (7th Cir. 1997) (referring to L.R. 56.1's predecessor rule, the court affirmed the district court's taking as true uncontroverted facts alleged in the movant's statement and supported by references to the record); *see also Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies."). The Court thus proceeds by crediting only those statements that are adequately supported in the record and relevant to the resolution of the Motions. As explicated in the related cases, Defendants' frequent objections to cited emails on authenticity and hearsay grounds are overruled unless indicated otherwise in the text of the Court's analysis. The few other objections relevant to material facts are addressed below, alongside the <u>relevant</u> facts (that are undisputed unless otherwise indicated).

## I. Background

The Court also, at this point, adopts the general background information established as undisputed in the related cases without repopulating the same record with new citations. That includes the following: (Former defendant) Chase Real Estate, LLC, owned and managed by Christian Chase, provided certain services to brokers for a fee, including allowing the brokers to use the www.mychaseagent.com domain and the mychaseagent.com email. Defendant Marcin Chojnacki ("Chojnacki") is a licensed real estate broker and was the designated managing broker

for the Chase RE Roselle branch during the relevant time period. Robert Rixer ("Rixer") was a real estate broker for Chase RE Roselle during the relevant time period. Former Defendant Laurena "Lori" Mikosz also was a real estate broker for Chase RE Roselle during the relevant time period.

Chojnacki and Rixer jointly own Market Equities, Inc., a Delaware Corporation formed in 2022; Market Equities, Inc. is the sole owner of Illinois Assets as well as EJ Investments (since 2022) which in turn owns Mainstreet Property Management. Defendant EJ Investments (EJ) was formed by Chojnacki and Rixer in 2020 and was initially owned by Chojnacki and his then-fiancé Long (who also share children); in 2022, Chojnacki and Rixer's Market Equities, Inc., assumed ownership of EJ. Chojnacki's mother, Iwona, is EJ's bookkeeper. Rixer, Chojnacki and Long are signers on the EJ Investment bank account. Rixer and Chojnacki also co-own Citypoint Illinois LLC and have both been brokers there since 2023; Rixer became the managing broker for Citypoint in 2023. Chojnacki dispute that Long herself worked for Citypoint any earlier than April 2025. Rixer and Chojnacki also co-owned the now dissolved Illinois Assets LLC.

Long is involved in this action through her alleged involvement in some of the financial entities that Plaintiff argues make up the Citypoint/Citipoint Enterprise: now dissolved Defendant First National Financial (FNF), now dissolved entity Defendant TCF National Holdings (TCF), and Prairie Raynor. Long was the sole shareholder, officer and director of FNF prior to its dissolution on December 20, 2024; she was also the sole signatory on FNF's bank account. Although Rixer and Chojnacki created TCF, Long was the sole shareholder and officer of TCF via FNF; Long was also the sole signatory on the bank account and sole person who had authority to act on behalf of the bank account for TCF, (which Defendants disputed in some cases but admitted on the *Malik* docket (Dkt. 436 ¶ 16), so the Court considers it admitted. Through this organizational structure, Long was the face of TCF; a design that Plaintiff asserts was to conceal Rixer and

Chojnacki from the public record, whereas Chojnacki assert was a decision made for branding purposes.

Former Defendant Rachel Irwin was an employee of Chojnacki's now dissolved Chojnacki Real Estate, Inc. corporation, and then an employee of former Defendant Midwest Title and Closing Services, which she co-owned with Chojnacki. Irwin was also General Counsel for Rixer and Chojnacki's EJ Investments and a shareholder of XYZABC, Inc., a Delaware corporation that she co-owned with Chojnacki. XYZABC, Inc. was the manager of Midwest Title and Closing Services. Via these entities, Irwin communicated with Chojnacki, Rixer, and Long's lenders, organized entities, prepared operating agreements and bylaws, amendments to bylaws and operating agreements, and other legal documents for Chojnacki, Rixer, Long and their entities; Irwin also acted as "Seller's" attorney for Chojnacki, Rixer, Long and their entities.

This case also features the Murphy Defendants. Murphy was the sole shareholder, President, and Director of 1st Midwest Financial, Inc. ("1st Midwest") (prior to its dissolution) and went to school with Chojnacki. Murphy testified that 1st Midwest's business was to hold title to properties for agents. Murphy views this as a project designed to generate passive income, but Plaintiffs dispute this characterization, arguing that a trier of fact could conclude the purpose was to permit others to shield their identity.

The corporate address initially listed on the Secretary of State's website for 1st Midwest was 1046 Midwest Road, in Northbrook, before being properly corrected to 1046 Midway Road in Northbrook, which the Murphy Defendants contend was a clerical error while Plaintiff argues it was part of a broader scheme to intentionally misstate the address.

## II. The Nowakowski Connection

With that, the Court turns to the facts that connect Nowakowski with this complicated web of actors. Nowakowski, a resident of Elmhurst, Illinois, with a background in real estate investing, saw an advertisement on social media in 2017 inviting the reader to contact Chase Real Estate Services also known as "Flip Chicago" which identified itself as a system for real estate investment. (Dkt. 110 ¶¶ 1, 3–4, 11). After seeing the social media ad, Nowakowski submitted her contact information for additional information on Flip Chicago's operations and visited the Flip Chicago website. (Dkt. 110 ¶ 11). Nowakowski would go on to purchase three properties from Defendants, the first two of which she purchased from FNF: 15849 S. Dante Dr., South Holland, IL (the "Dante Drive Property") and 17809 John Ave., Country Club Hills, IL (the John Avenue Property). (Dkt. 111 ¶ 5).

Nowakowski was contacted by Chojnacki after she submitted her contact information to the Flip Chicago website. (Dkt. 110 ¶ 13). Nowakowski and Chojnacki had a series of phone calls and email exchanges to discuss Nowakowski's investment goals, including purchase preferences and the services offered throughout the purchasing, renting, and maintenance life of any potential rental property. (Dkt. 110 ¶ 13; Dkt. 118 ¶ 41). Shortly after her introductory phone calls and emails with Chojnacki, on June 9, 2017, Nowakowski received an email from Chojnacki that showcased the Dante Drive Property as a potentially attractive investment based on their conversation about her preferences. (Dkt. 110 ¶ 14). In that June 9th email, Chojnacki outlined a purchase and "flip" plan whereby Nowakowski could purchase the Dante Drive property for $65,000. As part of the "flip" plan, Chojnacki estimated at closing and holding costs would total $5,000, rehab costs of approximately $55,000, closing costs and commissions on the sale side of approximately $9,800, for an all-in "break even" expense of $133,800. (Dkt. 110 ¶ 15). Chojnacki projected a "[potential resale value of $180,000] (pretty conservative). I would be listing for

199,900 and there is a VERY good chance we could get that number. We would have to be at about 65k on the purchase. Needs 55k in work." (Dkt. 110 ¶ 16; Dkt. 118 ¶ 48). Nowakowski testified that she did not believe that Chojnacki had guaranteed a sales price of $180,000 or higher. (Dkt. 110 ¶ 16). The next day, Nowakowski responded to Chojnacki that she was interested in the property and would drive by it that evening. (Dkt. 110 ¶ 17). Nowakowski testified that she believed she drove by the Dante Drive property but did not stop or walk around the premises. (Dkt. 110 ¶ 17).

Ultimately, Nowakowski requested that a purchase agreement be drafted for her intent to purchase the Dante Drive property for $67,000, which was $2,000 more than Chojnacki's suggested $65,000.00. (Dkt. 110 ¶ 18; Dkt. 118 ¶ 50).[2] That agreement was signed by Nowakowski on June 13, 2017. (Dkt. 110 ¶ 18). Nowakowski testified that she read the entire agreement before signing it. (Dkt. 110 ¶ 18). The Dante Drive purchase agreement included language that "the Property is sold in its 'AS IS' CONDITION, with no warranties made by seller." (Dkt. 110 ¶ 19). Nowakowski testified that she understood that to mean that "she couldn't blame the seller for any issue that came up" like "unseen repairs or something like that." (Dkt. 110 ¶ 19). Nowakowski was represented by an attorney—former Defendant Brenda Murzyn—for her purchase and eventual resale of the Dante Drive property. (Dkt. 110 ¶ 20).

Nowakowski's purchase of the Dante Drive property was an all-cash purchase. (Dkt. 110 ¶ 21). Nowakowski did not order an inspection of the Dante Drive property prior to closing. (Dkt. 110 ¶ 21). The closing on the Dante Drive property occurred on June 28, 2017. (Dkt. 110 ¶ 21). At the time of her purchase of the Dante Drive property, Nowakowski testified that she "was either

[2] As throughout many of the related cases: Long (the seller of the Dante Drive property through FNF) does not dispute that the deed vesting title with FNF was not recorded by former Defendant Lakeland Title until after Nowakowski had closed on the Dante property, but Chojnacki does. (Dkt. 118 ¶ 55; Dkt. 120 ¶ 55).

going to resell it or rent it" but was not "100% sure at the time." (Dkt. 110 ¶ 22). In either scenario, Nowakowski knew that repairs to the property would need to be done. (Dkt. 110 ¶ 22).

Shortly after the Dante Drive closing, Chojnacki presented Nowakowski with several options for remodeling the property, including a roof repair. (Dkt. 110 ¶ 23). Nowakowski approved of the work and pricing for the contractors presented by Chojnacki. (Dkt. 110 ¶ 23). Nowakowski testified that she did not shop around for additional quotes or contractors and agreed that it was ultimately her decision whether or not to hire any particular contractor. (Dkt. 110 ¶ 23). After the agreed upon repairs of the Dante Drive property were complete, Nowakowski listed it for sale on December 19, 2017 with an asking price of $200,000. (Dkt. 110 ¶ 24). Nowakowski agreed to a sale price from a buyer of $196,000 for the Dante Drive property after it was on the market for eighteen days. (Dkt. 110 ¶ 25). Nowakowski closed on the sale of the Dante Drive property of February 16, 2018 with a settlement price of $196,000. (Dkt. 110 ¶ 26). Nowakowski testified that in the sale for $196,000, she "made what I thought was less profit than what was proposed to me," though she acknowledged it was above Chojnacki's estimated $180,000 sales price. (Dkt. 110 ¶¶ 26–27).

At the time of the resale closing of the Dante Drive property, Nowakowski testified that her experience with that "flip" of the Dante Drive property did not scare her off from further investing in real estate with Chojnacki. (Dkt. 110 ¶ 28). In or about January of 2018, Nowakowski received an email from Chojnacki presenting another potential investment opportunity the John Avenue Property. (Dkt. 110 ¶ 29). Nowakowski entered into a purchase and sale agreement for the John Avenue property on January 29, 2018 for a purchase price of $79,000. (Dkt. 110 ¶ 30). The John Avenue purchase agreement included language that "the Property is sold in its 'AS IS' CONDITION, with no warranties made by seller." (Dkt. 110 ¶ 31). Nowakowski testified that she

read the contract before signing it. (Dkt. 110 ¶ 31). Nowakowski was represented by an attorney—Vincent Incompero—for her purchase of the John Avenue property. (Dkt. 110 ¶ 32). Nowakowski's purchase of the John Avenue property was an all-cash purchase. (Dkt. 110 ¶ 33). Nowakowski did not order an inspection of the John Avenue property prior to closing. (Dkt. 110 ¶ 33). She testified that Chojnacki told her that an inspection "wouldn't add anything" and that there was no point in getting an independent person when his team would provide rehab estimates. (Dkt. 118 ¶ 58).

The closing on the John Avenue property occurred in February of 2018 for a settlement price of $79,000. (Dkt. 110 ¶ 34). Nowakowski testified that Chojnacki referred Nowakowski to a rental agency to help her find tenants and manage the John Avenue property in May of 2018. (Dkt. 110 ¶ 35). Nowakowski also testified that she changed property management companies shortly thereafter. (Dkt. 110 ¶ 35). Nowakowski testified that the John Avenue property was fully leased and occupied by renters other than a few disruptions in the spring of 2024 when the property was managed by her second management company. (Dkt. 110 ¶ 36). Nowakowski still owns and collects rental income from the John Avenue property. (Dkt. 110 ¶ 37).

Nowakowski testified that following the purchase of her Dante Drive property and during the purchase process of the John Avenue property, she communicated to Chojnacki that she was interested in acquiring additional rental properties. (Dkt. 110 ¶ 39). In early 2018, Chojnacki communicated with Nowakowski and presented her with an investment opportunity for a three-unit building located at 2645 Huron Street in Chicago, Illinois. (Dkt. 110 ¶ 40). On December 6, 2017, the Huron Street property was listed for a sale price of $425,000. (Dkt. 110 ¶ 41). The listing stated the property was being sold "As Is" and that the "[p]roperty needs some updating." (Dkt. 110 ¶ 41). Nowakowski entered into a purchase and sale agreement for the Huron Street property

on February 1, 2018 for a purchase price of $383,000. (Dkt. 110 ¶ 42). The Huron Street purchase agreement included language that the property was sold in its "AS-IS" condition, with no warranties made by seller." (Dkt. 110 ¶ 43). Nowakowski testified that she read the contract before signing it. (Dkt. 110 ¶ 43). Nowakowski's purchase of the Huron Street property was an all-cash purchase. (Dkt. 110 ¶ 46). Nowakowski did not order an inspection of the Huron Street property prior to closing. (Dkt. 110 ¶ 46). Nowakowski closed on the Huron Street property on March 16, 2018 for a settlement price of $383,000. (Dkt. 110 ¶ 47). Nowakowski testified that her intention was to utilize the Huron street property as a rental property. (Dkt. 110 ¶ 48).

Chojnacki puts forth that Nowakowski signed a dual agency agreement with Chojnacki for the purchase of the Huron Street property, disclosing Chojnacki as the agent for both the seller and the buyer; Defendant's Exhibit M, however, is missing the page that includes the "optional paragraph 31" for "if dual agency applies. (Dkt. 110 ¶ 44). Plaintiff contends that the document does not disclose Chojnacki as both agents but rather indicates that Chojnacki "may undertake a dual representation, and testified that she would not have agreed to it if she knew Chojnacki and his affiliates had just acquired the house while he was acting as her agent. (Dkt. 110 ¶ 44).

Shortly after the March 2018 closing, Nowakowski accepted the recommendation from Chojnacki for a contractor to complete the necessary repairs on the Huron Street property. (Dkt. 110 ¶ 49). Sometime in the summer of 2018, near the end of the contractor's work on the Huron Street property, Nowakowski was notified that the property was subject to a lawsuit by the Drug Enforcement Division of the City of Chicago; the contractor halted all work in progress because he, himself, became aware of a city of Chicago Drug Enforcement code violation prosecution pending on the property when he received the large package of legal documents constituting code violation litigation papers. (Dkt. 110 ¶ 50; Dkt. 118 ¶ 62). Prior to the lawsuit being served on

Nowakowski, it was previously served on Defendant First Midwest Financial through Defendant Kendall Murphy on May 18, 2018; the summons compelled his appearance on May 31, 2018, at which date he was dismissed as a defendant and Nowakowski was added. (Dkt. 121 ¶ 63; Dkt. 118 ¶ 63). Nowakowski testified that the City of Chicago informed her lawyer that the repairs already completed on the Huron Street property needed to "come out" because the "drug unit needed to do a bunch of inspections." (Dkt. 110 ¶ 51). Nowakowski's attorney negotiated an agreement with Chicago Title Insurance Company and URB Remodeling Services to cure the violations and complete the necessary repairs on the Huron Street property. (Dkt. 110 ¶ 52). Nowakowski claims that the settlement did not cover all of the violations, the damages stemming therefrom, or the loss of rent because the property could not be occupied, which Chojnacki disputes as unsupported by competent evidence. (Dkt. 110 ¶ 64). Chojnacki maintains that neither he nor any of the contractors he recommended were aware of the government lien on the property at the time of Nowakowski's purchase or during the subsequent renovation work. (Dkt. 118 ¶ 62).

URB Remodeling Services served as the general contractor to complete the remaining repairs to comply with the City of Chicago's inspections and violations. (Dkt. 110 ¶ 53). Nowakowski also testified that City of Chicago had issued approximately thirty building and zoning violations and that the property was already subject to an "open lawsuit" concerning those violations, exposing her to daily fines and requiring extensive remediation efforts; however, Plaintiff provides only her own testimony without citation to documentation in support of the statement (which Chojnacki disputes). (Dkt. 118 ¶ 70). Nowakowski testified that she decided to sell the Huron Street property, listing the property for $570,000 on March 1, 2023, and going under contract on March 6, 2023; the property closed on April 4, 2023, for $605,000. (Dkt. 110 ¶¶ 54–55).

Nowakowski seeks $98,000 for the difference that the Defendants allegedly pocketed between purchasing the three properties and then selling them to Nowakowski, as well as $408,000 for unexpected and undisclosed repairs, unexpected vacancies, undisclosed building violations. (Dkt. 118 ¶ 71; Dkt. 110, Exhibit 1). When Defendants asked for more information about the calculations undergirding those damages, they received an answer similar to all the Plaintiffs' in the related cases: "See Master Spreadsheet; See Plaintiff's Complaint and Exhibits; see Nowakowski0001,0002." (Dkt. 110 ¶ 57).

**LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

**DISCUSSION**

Chojnacki, the Murphy Defendants, and the Long Defendants individually violated 18 U.S.C.§ 1962(c), (d). (Dkt. 1 ¶¶ 138–148). Given the fact that the Defendants filed substantively comparable motions for summary judgment in all of the related cases, the Court assumes familiarity with the analysis laid out in *Malik et al v. Prairie Raynor LLC et al*, 23-cv-1182, and related dockets. Indeed, in this case, the Parties regurgitate their arguments with regard to the RICO claims almost verbatim, so the Court need not re-explicate its analysis on the same: there can be no "lost investment bargain" theory of RICO injury where the value of property sold is not as high as represented, but is at least what the Plaintiffs paid for it. On this record, nothing indicates that Lin did not get the benefit of his bargain.

It is altogether different, however, to allege a RICO violation where the RICO scheme diminishes the actual value of property—in this case, Nowakowski's claims about back-end damages. Defendants contend that Nowakowski's claims about additional costs, repairs, and delinquent tenants are insufficient and vague, but those arguments speak not to the validity of a claimed injury for RICO standing purposes and instead go to the scope of damages (if any), a query that is best fit for a jury's resolution. While "logically related, a property interest and a measure of damages are not the same thing." *See Ivar v. Elk River Partners, LLC*. 705 F. Supp. 2d 1220, 1234 (D. Colo. 2010). Thus, Nowakowski's claims can proceed on the alleged financial injuries descending from the representations made around the actual transaction. A full review of the record, including facts contested and uncontested, could conceivably allow a reasonable jury to find that Chojnacki participated in the operation or management of an enterprise to lure in investors through misrepresentations of building ownership, condition, and—with regard to tenants—its occupancy and rental rates.

The Court next turns to Long's primary contention in support of her Motion: that the nexus between her and the enterprise is "based on the alleged relationship" with Chojnacki. (Dkt. 99-1 at 4). Yet this is a misstatement of the record. Nowakowski purchased property from FNF directly. This Court cannot grant summary judgment on these facts.

Further, the analysis laid out in the related cases governs Long's and the Murphy Defendants' contentions that the allegations of wire and mail fraud in the Amended Complaint are directed at other co-Defendants. It is possible for a jury to find that Long and Murphy were sufficiently engaged in the enterprise under § 1962(c) to be liable for the predicate acts despite not being as central to the encounters as Chojnacki. Further, under § 1962(d), that contention is irrelevant. Liability under that portion of the statute requires only that the defendant agree that "*someone* would commit at least two predicate acts to accomplish these goals" even if she herself does not.[3] *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (emphasis added). Of course, it is ultimately possible for a jury to find that the evidence showing that these Defendants' financial involvement with regard to the property ownerships was entirely legitimate. Yet the argument that NO reasonable jury could find for Plaintiff on this claim is unpersuasive.

Section 1962(c) makes it illegal "to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs." 18 U.S.C. § 1962(c). The Supreme Court has interpreted "the word 'conduct' to require some degree of direction and the word 'participate' to require some part in that direction." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). The Court explained that this "interpretation is meant to prevent section 1962(c) from reaching 'complete outsiders' who did not participate 'in the conduct of the enterprise's affairs but rather just their own affairs . . . [i]n other words, to be liable under section 1962(c), one must participate in the operation or

[3] The Amended Complaint appears to alternatively plead the conspiracy claim— § 1962(d)—in alleging "§ 1962(c), (d)."

management of the enterprise itself." *Id*. (internal citations omitted). Plaintiff's evidence, though shaky at times, could sufficiently tie the Murphy and Long Defendants to the enterprise (even aside from the prior romantic relationship with Long and Chojnacki, which would be insufficient on its own to meet this standard).

A § 1962(c) claim does not require proof that a defendant was the exclusive "boss" of the operation so long as a jury could find him reasonably involved in managing it. *See Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021) ("Lower-rung participants and even third-party outsiders can be liable, provided they play a part in operating or managing the enterprise"). The significant financial overlap, alleged lies regarding property ownership, entanglements disguising actual owners, and copious legal entities could allow a jury to infer the Long and Murphy Defendants knowing participated in the scheme to saddle investors with misrepresented properties. Although mere allegations of a conspiracy are insufficient to withstand a motion for summary judgment, a "conspiracy may be proven by circumstantial evidence and should not be taken from the jury as long as there is a possibility that a jury can reasonably infer from the circumstances that the required elements of conspiracy have been met." *See Chicago Miracle Temple Church, Inc. v. Fox*, 901 F.Supp. 1333, 1348 (N.D.Ill.1995). Although it is a close question whether a jury could find that there was an agreement, drawing all inferences in favor of Plaintiffs, the Motions for Summary Judgment on Count I are otherwise denied.

**I. State-Law Claims (Counts II–VI)**

Next, Chojnacki moves for summary judgment on the Chen Plaintiffs' state law claims for common-law fraud (Count II), violation of the ICFA (Count III); violation of the IRELA (Count IV); and negligent misrepresentation (Count V). (Dkt. 175). All sets of Defendants filed for summary judgment on Count VI, unjust enrichment.

**a. Count II: Common Law Fraud and Count V: Negligent Misrepresentation**

"In order to establish fraud under Illinois law, a plaintiff must prove that (1) defendant made a false statement; (2) of material fact; (3) which defendant knew or believed to be false; (4) with the intent to induce plaintiff to act; (5) the plaintiff justifiably relied on the statement; and (6) the plaintiff suffered damage from such reliance." *Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000) (citing *Williams v. Chicago Osteopathic Health Sys.*, 654 N.E.2d 613, 619 (Ill. 1995)).

Negligent misrepresentation has essentially the same elements, except "the defendant need not know that the statement is false. His own carelessness or negligence in ascertaining its truth will suffice for a cause of action." *Doe v. Dilling*, 228 Ill. 2d 324, 360 (Illinois 2008). "For negligent misrepresentation, a plaintiff must also allege that the defendant owes a duty to the plaintiff to communicate accurate information." *Id.* (citing *Board of Education of City of Chicago v. A, C & S, Inc.,* 546 N.E.2d 580 (Illinois 1989)).

Starting with Count II: this case is different from many of the related cases in that Chojnacki was much more hands on with Nowakowski than in the cases where Chojnacki never had pre-closing conversations with the plaintiffs about the properties they were purchasing. In pursuit of their summary judgment motion, Chojnacki contends that since Nowakowski's goal as an investor was to make money, the identity of the seller she purchased from had no effect on the value of the properties when she purchased them or her projected profits. (Dkt. 102 at 9). This contention struggles. It is not the identify of the seller itself that speaks to materiality and reliance; rather, it is Chojnacki and the team of individuals that Nowakowski understood to be acting in her own best interest. A jury could fairly find that Nowakowski fairly relied on Chojnacki's known false statements about the properties in a way that materially impacted the transactions' anticipated

value. While it is of course true that the basic duty of care of a fraud victim is breached when the victim closes his eyes to a risk that is obvious or known, *Sain v. Nagel*, 997 F. Supp. 1002, 1014 (N.D. Ill. 1998), it is also true that a "victim of fraud need not dig beneath apparently adequate assurances," *id.* This is not a record upon which summary judgment on Count II or Count V[4] can be granted.

**b. Count III: ICFA**

In Count III, Plaintiff alleged that Chojnacki violated Illinois's consumer protection statute, the ICFA. *See* 815 ILCS 505/1–505/12. "To prevail on a claim under the ICFA, a plaintiff must plead . . . that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (quotation marks omitted). "The Illinois Consumer Fraud Act affords broader protection to consumers than the cause of action available under common-law fraud." *Letoski v. Coca-Cola Co.*, 753 F. Supp. 3d 650, 664 (N.D. Ill. 2024)*; Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 751 (Illinois 1994) ("[T]he intent of the Consumer Fraud Act was to lessen the burden of proof in a claim for certain misrepresentations."). "Therefore, to state a cause of action for statutory fraud, a party need not prove all the elements of common law fraud." *Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 898 N.E.2d 194, 203 (Ill. App. 2008) (citation omitted).

" 'Intent' under the Act means 'that the defendant intends for the plaintiff to rely on the deception' rather than 'the defendant's intent to deceive' under common-law fraud." *Letoski*, 753

---

[4] While Illinois law generally bars plaintiffs from asserting tort claims such as negligent misrepresentation where they seek to recover only economic losses, it is subject to certain exceptions where "one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations," an exception that has been applied to real estate brokers. *See Am. Inter-Fid. Corp. v. M.L. Sullivan Ins. Agency, Inc.*, 2016 WL 3940092, at *8 (N.D. Ill. July 21, 2016) (collecting cases).

F. Supp. 3d at 664. Conduct is deceptive "if it creates a likelihood of deception or has the capacity to deceive" a "reasonable consumer." *Benson*, 944 F.3d at 646. It is unfair if it offends public policy; is "immoral, unethical, oppressive, or unscrupulous"; and causes substantial injury to consumers. *Id.* at 647.

A buyer must prove either 1) "the buyer would have acted differently knowing the information" or the act "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203 (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 584 (Illinois 1996)). "Furthermore, a plaintiff's actual reliance is not required, but a plaintiff must show that defendant's consumer fraud proximately caused their injury." *Id.*

Here, a reasonable jury could find that Chojnacki's behaviors, were designed to induce Nowakowski's reliance on the inefficient and old-school seller narrative and/or foreclosing bank deals. Plaintiff also has presented evidence of a potential scheme to convince sellers of a bargain real estate deal that simultaneously provided Defendants with a near-guaranteed investment opportunity. A jury could find that the scheme alleviated some of the traditional risks of real estate investments for Defendants—namely, the ability to flip the property for a profit—by ensuring a buyer was ready to go on the flip before Defendants even finalized their initial purchase. On this record, it remains disputed whether Chojnacki's conduct "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203.

Defendants also contend that Nowakowski has presented no evidence of damages because she has not sufficiently tied damages to this part of his claim. (Dkt. 102 at 10-11). Yet Nowakowski has offered some evidence on damages from unexpected repairs, unexpected code compliance,

unexpected building code violations and evictions, and it is up to the jury to assess the validity, if any, of that sum. It is true that the "as-is" nature of the sale may impede the back-end damages claims, but if a jury finds that the sale itself was a product of illegal behavior, it may assess the claim differently.

In analyzing a claim under the Illinois statute, courts consider "the totality of the information made available to the plaintiff." *Benson*, 944 F.3d at 646 (citing *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005)). That inquiry, by its definition, will peer beyond the singular "seller's identity" quotation to assess the full picture available to Nowakowski in her dealings with Defendants.

**c. Count IV: Illinois Real Estate License Act**

Nowakowski did not acknowledge that she had ever brought an IRELA claim in his summary judgment briefing. When a party fails to address an argument in his summary judgment response, it is deemed a waiver. *See Roe–Midgett v. CC Servs., Inc.*, 512 F.3d 865, 876 (7th Cir.2008); *Palmer v. Marion County*, 327 F.3d 588, 597–599 (7th Cir.2003); *Schramm L. Grp., LLC, v. Pitney Bowes Inc.*, 2026 WL 636820, at *2 (N.D. Ill. Mar. 6, 2026) ("The Court needn't consider . . . 'underdeveloped, conclusory, and undeveloped' argument[s].") (cleaned up); *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at the summary judgment stage, it is "not the district court's job to sift through the record and make (a party's) case for him"). As courts have often admonished, "summary judgment is the 'put up or shut up' moment in the life of a case," *see, e.g.*, *In re Airadigm Communications, Inc.*, 616 F.3d 642, 657 (7th Cir.2010). After the defendant has made its showing, the non-moving party must come forth with evidence showing what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the non-moving party fails to do so, summary judgment is proper. *United States*

*v. Selenske*, 882 F.2d 220 (7th Cir.1989). Accordingly, Chojnacki is entitled to summary judgment on Count IV.

**d. Count VI: Unjust Enrichment**

That leaves the final state-law claim: Count VI: unjust enrichment. All three sets of Defendants moved for summary judgment on Count VI, the only state-law claim pleaded against the Murphy Defendants and the Long Defendants. As this Court has already spelled out in *Malik*, Illinois law does not consider unjust enrichment an independent cause of action. *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) (finding no standalone claim for unjust enrichment under Illinois law); *Flores v. Aon Corp.*, 242 N.E.3d 340, 356 (Ill. App. 2023) (quoting *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 484 N.E.2d 349 (Ill. App. Ct. 1985), *aff'd*, 499 N.E.2d 1319 (Ill. 1986)).

To the extent that the unjust enrichment claim is premised on Counts II, III, or V, the unjust enrichment claim can survive dismissal with regard to Chojnacki. *See id.* at 741–42; *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent *claim* of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well."). Because there are no alternative state law claims as to the Long and Murphy Defendants, their Motions are granted with regard to Count VI. *See Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 324 (7th Cir. 2021). ("To the extent that the unjust enrichment claim is premised on the ICFA or [common-law fraud] claims, the unjust enrichment claim cannot survive the proper dismissal of those matters.").

## CONCLUSION

For the below reasons, Chojnacki's Motion for Summary Judgment [101], the Long Defendants' Motion [99], and the Murphy Defendants' Motion [104] are granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants the Murphy Defendants' and the Long Defendants' Motion on Count VI for Unjust Enrichment. The Court grants Chojnacki's Motion with regard to violation of the IRELA (Count IV) and it denies the motion as to common-law fraud (Count II); violation of the ICFA (Count III); negligent misrepresentation (Count V); and the follow-on claim of unjust enrichment (specifically for Chojnacki) (Count VI), which remain in the case and will proceed to trial unless the parties can reach a settlement.

Virginia M. Kendall
United States District Judge

Date: September 9, 2026